### FURMAN UNIVERSITY v. WALLER *ET AL.*

(117 S. E., 356.)

1. CONTRACTS—UNENFORCEABLE UNLESS SUPPORTED BY CONSIDERATION.— A simple contract is incapable of becoming the subject of an action unless supported by a consideration.

2. CONTRACTS—"CONSIDERATION" DEFINED.—A valuable consideration may consist either in some right, interest, profit, or benefit, accruing to one party, or some forebearance, detriment, loss, or responsibility given, suffered, or undertaken by the other.

3. SUBSCRIPTIONS—BEFORE ACCEPTED AND ACTED ON MAY BE WITHDRAWN.—A subscription for a charitable purpose is merely a continuing offer to make a gift, and is unenforceable until accepted and acted upon by promisee in such a manner as to establish mutuality of obligation.

4. SUBSCRIPTIONS—PROMISEE ASSUMING OBLIGATION RELYING ON SUBSCRIPTION HELD TO SUPPLY CONSIDERATION.—Where promisee has before withdrawal accepted the subscription, agreed to apply the promised contribution to the purpose for which it was subscribed, and has assumed an enforceable obligation, consideration to support promisor's agreement is supplied by promisee's enforceable obligation.

5. CONTRACTS—PROMISE FOR PROMISE HELD CONSIDERATION.—A promise for a promise is a sufficient consideration.

6. CONTRACTS—MUTUAL PROMISES SIMULTANEOUS WHEN CONTINUING PROMISE INDUCED RECIPROCAL PROMISE.—Mutual promises are simultaneous when the continuing promise is the inducement for the reciprocal promise.

7. SUBSCRIPTIONS—EXPENDING MONEY OR INCURRING LIABILITIES RELYING ON SUBSCRIPTION HELD CONSIDERATION.—Where promisee on the faith of the subscription before its withdrawal expended money or incurred liabilities in furtherance of the enterprise that promisor intended to promote, promisee's reciprocal promise required to supply the consideration will be implied, or the expense incurred or liabilities assumed will be regarded in the nature of an executed consideration induced by 'the request impliedly contained in the subscription offer.

8. SUBSCRIPTIONS—SUBSCRIBER'S PROMISE NEED NOT BE SOLE INDUCEMENT TO BENEFICIARY'S EXPENDITURE.—It is not essential for the sufficiency of the consideration that subscriber's promise be the sole inducement to the activities and expenditures of beneficiary.

9. SUBSCRIPTIONS—PROMISES BY OTHER SUBSCRIBERS MAKE UNENFORCEABLE RECIPROCAL OBLIGATIONS.—Where a number of subscribers promise to contribute money to accomplish a result of interest to all, and which cannot be accomplished save by their common performance, there is such privity as will make the mutual promises constitute reciprocal obligations, enforceable at the instance of those charged with the duty of carrying into effect the common purpose.

10. SUBSCRIPTIONS—AFTER EXPENDITURES MADE, OR OTHER SUBSCRIBERS INDUCED TO SUBSCRIBE, SUBSCRIBER ESTOPPED TO WITHDRAW SUBSCRIPTION.—Where promisee has expended money or incurred liabilities on the faith of a subscription, or it is within the contemplation of subscriber that his contribution will be used to induce others to subscribe, and additional subscriptions are made by reason of such inducement, even in part, the substantial elements of an estoppel. are present.

11. SUBSCRIPTIONS—SUBSCRIPTION TO UNIVERSITY WHICH HAS BEEN ACTED ON HELD VALID.—A subscription to Furman University made through a Baptist Church, the first payment of which had been made, and in reliance on which other subscriptions had been made and obligations incurred, *held* an enforceable contract.

12. TRIAL—ORDINARILY EXCLUSIVE PREROGATIVE OF JURY TO PASS ON FACTS.—Ordinarily it is the exclusive prerogative of the jury to pass on the credibility of witness and to find the facts.

13. TRIAL—DIRECTED VERDICT NOT ERROR WHERE COURT JUSTIFIED IN SETTING ASIDE VERDICT.—Where the evidence adduced by a party is uncontradicted, not conflicting or contradictory in itself, and of such conclusive force as would warrant the Circuit Judge in setting aside a verdict, the direction of a verdict is not error.

14. SUBSCRIPTIONS—CONTENTION THAT PROMISEE WAS NOT JUSTIFIED IN RELYING ON REVOCABLE SUBSCRIPTIONS HELD WITHOUT MERIT.— A contention that promisee was not justified in relying on subscriptions, most of which were revocable, *held* without merit where subscription in question was not revocable, and was relied on.

Before WILSON, J., Greenwood, April, 1922. Affirmed.

Action by the Furman University against Coleman B. Waller and another as administrators of the estate of C. A. C. Waller, deceased. From a judgment for plaintiff entered on a directed verdict, defendants appeal. Affirmed.

*Messrs. Grier & Park,* for appellants, cite: *Contract was without consideration, a nudum pactum and void:* 1 Ell. Conts. Sec., 227; 8 R. C. L., 1399–1400; 200 S. W., 663; 166 Pac., 1148; 99 Atl., 793; 48 L. R. A. (N. S.), 783; 8 A. S. R., 767. *Gift to take effect in future is in nature of a will and must be executed as such:* 2 Strob. Eq., 244; Rich. L., 10; Rich. Eq., 262; 2 Bail. L., 588; 83 S. C., 329; 85 S. C., 383. *Pledge was for no specific purpose:* 141 Mass., 195. *Rule as to charitable subscriptions:* 8

A. S. R., 767; 6 Mo. App., 150; 123 Mass., 528; 11 Pac., 592; 96 Ill., 177; 79 Ill., App., 452; 42 N. W., 738; 4 Me., 382; 56 N. Y. Supp., 518; 20 Pa., 260; 17 Pa. Co. Ct., 614; 13 Phila., 241; 36 Wis., 404; 43 Wis., 63; 122 N. W., 719; 17 Ann. Cas., 1074. *When promise for promise will constitute consideration:* 1 Ell. Conts., Sec., 231; 71 Io., 596. *Expenditures by donee on faith of pledge is question for Jury:* 69 A. S. R., 249.

*Messrs. Haynesworth & Haynesworth* and *Tillman, Mays & Featherstone,* for respondent, cite: *Pledge was mutual contract and enforcible:* 28 S. C., 476; 143 N. W., 1087; 50 L. R. A. (N. S.), 835; 25 R. C. L. *"Subscriptions":* P. 1398, Sec., 4; 36 L. R. A., 239; 60 A. S. R., 727; 131 N. W. 416; 16 Gray (Mass.), 196; 26 L. R. A., 306; 25 Am. Rep., 510; 48 L. R. A. (N. S.), 783; 48 L. R. A. (N. S.), 783.

April 10, 1923.

The opinion of the Court was delivered by MR. JUSTICE MARION.

This is an action to enforce a subscription for $10,000, made by the late C. A. C. Waller, of Greenwood, S. C., to "The Baptist 75 Million Campaign." Upon the trial of the cause in the Circuit Court, Hon. Jno. S. Wilson, presiding Judge, refused defendants' motion for a directed verdict, and granted a motion for the direction of a verdict in favor of the plaintiff. From judgment thereon, defendants appeal.

At the trial evidence was adduced by plaintiff tending to establish the allegations of the complaint. The defendants offered no evidence. The defendants' motion for the direction of a verdict was therefore substantially a demurrer to the evidence of the plaintiff. The issue thus made might perhaps have been more properly raised by a demurrer to the complaint. *Greenwood Cotton Mill v. Tolbert,* 105 S. C., 273; 89 S. E., 653; Ann. Cas. 1917C, 338. The two

exceptions, however, assigning error in the refusal of defendants' motion and in the granting of plaintiff's motion for a directed verdict, squarely present the question of whether the Waller subscription was such a valid and enforceable contract as warranted the trial Judge, under the evidence adduced, in directing a verdict for the plaintiff.

The appellants' first and main contention is that the evidentiary facts adduced and relied upon by plaintiff are insufficient to establish a binding legal obligation. They say that the subscription of Mr. Waller was a *nudum pactum*, a mere naked promise to give something in the future, unsupported by a valuable consideration and unenforceable in law or equity; and that such conclusion of law is not affected and cannot be impeached by the facts, or any legitimate inference therefrom, adduced in evidence. The relevant facts upon which this inquiry turns may be thus stated. The subscription card is in the following form:

"The Baptist 75 Million Campaign Pledge Card. For the love of Christ, my Savior and Lord, and for the promotion of His Kingdom. I promise to contribute through the First Baptist Church, City, the sum of $10,000.00 during the next five years. Of this amount I will give $100.00 in cash and the remainder in four annual installments of $1,200.00 each and four M. $4,000.00 at the end of the five years. This pledge is made with the understanding: 1. That this pledge is in addition to my regular contribution to local church expenses and equipment; 2. That if I move my membership during the five-year period, I will pay the unpaid balance of the pledge through the church where I place my membership. All of this contribution is designated to Furman University."

By direction of Mr. Waller, the following provision of the printed pledge card was stricken out:

"That if I die, lose my health, or suffer financial reverses that destroy or seriously impair my earning power, this

pledge may be reduced or canceled upon request of myself
or family."

The subscription was made during the campaign, some
time between November 30 and December 7, 1919. The
general object of the campaign was to raise funds in sup-
port of foreign mission work, the orphanage, the hospital,
Baptist schools, and educational work. Furman University
is a corporation organized under the laws of this State and
is one of the regular Baptist institutions of the State, con-
trolled by and under the supervision of a board of trustees
elected by the Baptist State Convention. "It gives a college
education to boys of the State." Mr. Waller was a graduate
of Furman University, the holder of its degrees of M.A.
and M.M.P. He had served as vice-president of its
Alumni Association. He died intestate May 5, 1920, hav-
ing at that time made only the first cash payment, of
$100.00, on his subscription. He left a widow, but no
children. The so-called "75 Million Campaign" involved
an organized appeal to the Baptists of the State to subscribe
five and one-half million dollars. The Waller subscription
was a part of the amount which the First Baptist Church
of Greenwood was expected to raise. Subscriptions other
than this directly designating Furman University as the
beneficiary were actually received, and one of them, in the
sum of $25,000, was paid in cash. In reliance on these
subscriptions "all over the State," money was borrowed by
Furman University, and many improvements made. The
campaign closed on December 7, 1919, and a contract for
the erection of a new dormitory was entered into on De-
cember 30, 1919. The dormitory and other buildings were
erected, and land purchased for that and other purposes
of enlargement. The faculty and the students were doubled
in number. All of this was done on the strength of the
subscriptions secured in this campaign. The most of these
subscriptions contained the clause, which was stricken out
of the Waller subscription, to the effect that in the event

of death or disability the pledge might be reduced or canceled.

It is a singular and somewhat significant fact that the precise question here presented, viz., as to the validity of a pledge to contribute money or property for the promotion of a charitable or beneficent object, seems never to have been directly passed upon by the Courts of this State. It is one as to which the numerous cases from other jurisdictions, which we have carefully examined, disclose a considerable division, if not contrariety, of opinion among the Courts.

There is, of course, no difference among the authorities as to the basic elementary proposition that "a single contract is incapable of becoming the subject of an action unless supported by a consideration."

Nor is there any essential variance as to what constitutes a consideration, a satisfactory definition of which is thus given in *Currie v. Misa,* L. R., 10 Exch., 153:

"A valuable consideration, in the sense of the law, may consist either in some right, interest, profit, or benefit, accruing to the one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by the other."

See Clark on Contracts § 64, and our own cases of *Corbett v. Cochran,* 3 Hill, 41; 30 Am., Dec., 348; and *Ferrell v. Scott,* 2 Speers, 344; 42 Am. Dec., 371. But the diversity of opinion is as to whether a legal consideration for such an agreement may be found at all, and, if so, upon what ground it should properly be predicated. In an elaborate note to the case of *Young Men's Christian Association v. Estill* (Ga.), 48 L. R. A. (N. S.), 783, in which the decisions are very fully collated, the annotator thus refers to the trend of judicial authority:

"In a very few of the earliest cases, as will be observed, a narrow view was taken, and an agreement of this char-

acter to pay money to a charitable fund was regarded as purely gratuitous, a *nudum pactum,* a promise without consideration, and unenforceable on any legal ground; thus leaving the performance of the agreement to the conscience and sense of honor of the individual subscriber. * * * But the Courts soon receded from that position, and perhaps out of regard for public policy, and a desire to give greater stability and security to institutions thus largely dependent on donations from the public, began to look to other subscriptions to the same fund for a consideration for the one in question, * * * or to acts performed by the promisee on the faith of the subscription as constituting a consideration for it; * * * and generally the tendency has been to uphold the subscription as valid and enforceable wherever that was possible. It would appear, however, that the Courts of New York have been rather reluctant to follow this tendency, and have inclined to keep to a narrower view of the subject."

What we regard as the sounder and more modern view of this question, generally, may perhaps be best outlined and illustrated by extracts from several leading cases.

In the case of *Young Men's Christian Association v. Estill,* 140 Ga., 291; 78 S. E., 1075; 48 L. R. A. (N. S.), 783; Ann. Cas. 1914D, 136, the executors of Estill were held liable upon a verbal subscription to a Y. M. C. A. building fund. The Court said:

"A promise to donate money to a charitable purpose is gratuitous and unenforceable unless some consideration therefor exists. Such a promise amounts to nothing more than a voluntary offer which may be withdrawn before being acted on. But if, on the faith of the promise, the promisee before withdrawal of the promise, expends money and incurs enforceable liabilities in furtherance of the enterprise the promisor intended to promote, the consideration is supplied and the promise is rendered valid and binding. [Citing cases] 1 Page on Contracts, § 298; 1 Elliott

on Contracts, § 228. In 1 Parsons on Contracts (8th Ed. *453) it is said: 'On the important question, how far voluntary subscriptions for charitable purposes, as for alms, education, religion or other public uses, are binding, the law has in this country passed through some fluctuation, and cannot now be regarded as on all points settled. Where advances have been made, or expenses or liabilities incurred by others in consequence of such subscriptions, before any notice of withdrawal, this should, on general principles, be deemed sufficient to make them obligatory, provided the advances were authorized by a fair and reasonable dependence on the subscriptions; and this rule seems to be well established.' "

In the case of *Baptists Female University v. Borden,* 132 N. C., 476; 44 S. E., 47, a subscription of Judge Faircloth, for the purpose of aiding in the payment of certain indebtedness already created, was enforced in a suit against his executor. Mr. Justice Conner, after reviewing the authorities, in delivering the opinion of the Court, said:

"The university is duly incorporated, with the power to receive such subscriptions. It is under the control of the Baptists Church, of which the testator was a member. Its trustees had appointed agents to solicit subscriptions. It had incurred liabilities for their expenses and payment for their services. The subscription was made to the president of the university, and an announcement thereof made in the Baptist convention. The subscription was thereby accepted, and by its acceptance the university assumed the responsibility, duty, and obligation of applying the money to the purposes for which it was given. Other persons at said time and place made subscriptions for the same purpose. Announcements of each were made in the presence of Judge Faircloth. Most of these subscriptions were paid, and it must be understood, as a reasonable conclusion from the facts stated, that these subscriptions were made at the same time and place, and therefore operated as an induce-

ment for other persons to make subscriptions for the same purpose, which were received by the university, and the duty or trust thereby imposed of expending the money for the purposes for which it was given assumed by the officers of the university. We think that in either of the several points of view and in accordance with the definition of a valuable consideration hereinbefore given the promise was supported by such consideration. We are not inadvertent to the fact that there are a number of authorities holding the contrary. We have carefully examined the cases. and, in the absence of any controlling authority in this Court, we have come to the foregoing conclusion."

In *Irwin v. Lombard University,* 56 Ohio St., 9; 46 N. E., 63; 36 L. R. A., 239; 60 Am. St. Rep., 727, the administrator of one Gilpin sought to recover the amount of a note given by his intestate to the endowment fund of Lombard University. The Court said:

"It does not appear that anything of value passed from the university to Gilpin as a consideration for the note, nor that he requested it to expend money on the faith of his promise; nor that he requested others· to contribute to the endowment and support of the university, except as such requests are to be inferred from the circumstances of himself and others when they made donations and executed obligations of this character, and from the nature of the enterprise which he and other donors and obligors were alike desirous of promoting, and from the character and objects of the obligee. It does, however, appear that Gilpin and many others were interested in maintaining Lombard University as an institution of learning, and that, a charter having been obtained from the Legislature of Illinois, they undertook to contribute the funds necessary to the accomplishment of their purpose, some making donations in cash, others executing obligations of the character of that executed by Gilpin. It also appears that these donations and obligations were sufficient in amount and character to encourage

the corporation to expend money and incur obligations in carrying out the purposes of its creation. The enterprise to which Gilpin and others contributed and subscribed did not fail, but went forward. * * * Tested by either of the comprehensive definitions quoted the contract under consideration is valid and enforceable. By the desire of Gilpin, many other presons made donations in money and executed obligations to the university of like character with his, and his promise was an inducement to their donations and promises. It is true that this doctrine is rejected by the Supreme Court of Massachusetts in [Cottage Street, etc.], *Church v. Kendall* [121 Mass., 528; 23 Am. Rep., 286.] But in that State, one for whose benefit a contract is made by others, cannot maintain an action on it for want of privity. While in this State is has long been established that one for whose benefit others contract, upon a consideration sufficient as between themselves, may maintain an action for its enforcement. *Crumbaugh v. Kugler,* 3 Ohio St., 544. *Thompson v. Thompson,* 4 Ohio St., 333. *Emmitt v. Brophy,* 42 Ohio St., 82.

"It is equally apparent that, prompted by the promises and gifts of Gilpin and others, 'responsibility has been undertaken' by the university. It did not abandon the educational enterprise which these donors and promisors were desirous of promoting. Whether the object of the promisors was to secure the opportunity of educating their own children under such influences as they desired, or, more generally, to contribute to the public welfare by increasing the facilities for higher education, it has been accomplished. It has been accomplished by the expenditure of money and the incurring of obligations, in reliance upon their promises and similar promises from others.

"Institutions of this character are incorporated by public authority for defined purposes. Money recovered by them on promises of this character cannot be used for the personal and private ends of an individual, but must be used

for the purposes defined. To this use the university is restricted not only by the law of its being but as well by the obligations arising from its acceptance of the promise. A promise to give money to one to be used by him according to his inclination and for his personal ends is prompted only by motive. But a promise to pay money to such an institution to be used for such defined and public purposes rests upon consideration.

"The general course of decisions is favorable to the binding obligation of such promises. They have been influenced, not only by such reasons as those already stated, but in some cases, at least—by State policy as indicated by constitutional and statutory provisions. The policy of this State, as so indicated, is promotive of education, religion and philanthropy. In addition to the declarations of the Constitution upon the subject, the policy of the State is indicated by numerous legislative enactments providing for the incorporation of colleges, churches and other institutions of philanthropy, which are intended to be perpetual, and which not only for their establishment, but for their perpetual maintenance, are authorized to receive contributions from those who are in sympathy with their purposes and methods—the only source from which, in view of their nature, their support can be derived. Looking to the plainly declared purpose of the lawmaking department, promises made with a view to discharging the debts of such institutions, to providing the means for the employment of teachers, to establish endowment funds to give them greater stability and efficiency, and whatever may be necessary or helpful to accomplish their purposes or secure their permanency must be held valid. A view which omits considerations of this character is too narrow to be technically correct.

"It is not contemplated by the parties, nor is it required by the law, that in cases of this character the institution shall have done a particular thing in reliance upon a par-

ticular promise.    Not only do the law and the parties contemplate the permanency of the institution, but all promisors understand that the proceeds of their promises will be mingled with prior and subsequent donations and together constitute the financial support of the enterprise.    The cases must be rare indeed in which such contributions or promises would be made if others had not been made before, and rarer still, in which they would be made but for the belief that others will be made afterwards.    The requirements of the law are satisfied, the objects of the parties secured, and the perpetration of frauds prevented by the conclusion that the consideration for the promise in question is the accomplishment, through the university, of the purposes for which it was incorporated and in whose aid the promise was made.    The defense properly failed because there was neither allegation nor proof of abandonment of these purposes." .

In *Brokaw v. McElroy,* 162, Iowa, 288; 143 N. W., 1087; 50 L. R. A. (N. S.), 835, the action was on behalf of Kansas City University against the administrator of Murphey, who had given four notes amounting to $20,000, payable within a year after his death.    The Court said:

"A sufficient consideration in such a case as this may assume various forms.    It is not necessary that the benefit accrue to the promisor.    It is frequently, if not usually, true that written promises of this kind are made for the purpose of assisting in the maintenance of the beneficiary institution within the scope of the purpose for which it was organized.    Other assistance from other sources is expected.    A contribution by one naturally operates as an inducement to contributions by others.    It is not unusual that publicity is given to contributions already made as an inducement to others.    If it is within the contemplation of a contributor that the fact of his contribution may be announced to others as an inducement to contributions by them, and if additional contributions be made by reason of such

inducement even in part, it operates as a sufficient consideration for the promise of the first contributor. It is not essential, in such a case, that the additional contributions thus induced should be devoted to the same fund or to the erection of the same building. If the original promise, when made, was intended to induce activities and expenditures by the beneficiary in pursuance of the purpose of its organization, and if such activities and such expenditures were induced thereby even in part, it is a sufficient consideration. In either case, it is not necessary that such promise be the sole inducement either to additional contributions by other contributors or to burdensome activities and substantial expenditures by the beneficiary and its appropriate officers. It is not indispensable that direct evidence be had that such activities and expenditures or additional contributions were thus induced, or that such inducement was within the contemplation of the parties. If these facts can be found by fair inference from all the circumstances in evidence, it is sufficient at least to make a jury question. Such an institution as the beneficiary herein is necessarily supported by the cooperation of many people who have a common and unselfish interest in its success. Ordinarily, one man could not carry the load alone. Cooperation is usually within the contemplation of each contributor. His gift would become mere waste if it must stand alone. A contribution, therefore, may be in the nature of a response to a previous contribution by another, or it may be in the nature of an invitation to future contributions by others, or it may partake of the nature of both. All this may become a question of fact in a particular case. It would be manifestly unjust to permit a promisor of a contribution to withdraw his promise after it had served the function of inducing other contributors to incur obligations to the same beneficiary and for the same general purpose. We think that notes of this kind rest upon a somewhat different foundation from a note executed in a transaction, in con-

templation of a pecuniary benefit to the maker or to some other person selected by him, other than the payee. Such notes are frequently, if not usually, executed, not as evidence of a promise to make a future gift, but for the specific purpose of creating a present asset for its beneficiary. A very substantial part of the assets of such institutions exists in this form. To lightly withhold judicial sanction from such obligations would be to destroy millions of assets of the most beneficent institutions in our land, and to render such institutions helpless to carry out the purpose of their organization."

In the case of *Albert Lea College v. Brown,* 88 Minn., 524; 93 N. W., 672; 60 L. R: A., 870, the Court said:

"A legal consideration does not necessarily mean a pecuniary gain, and it is not essential to the validity of a contract that a benefit or gain of such a nature move to the person assuming an obligation. It is sufficient if any advantage or benefit result to him, or any detriment or injury to the other party, by his failure to keep his agreement. 6 Am. & Eng. Enc. (2d Ed.), 677 *et seq.*

"In the case at bar the trustees, upon the delivery of the note to them, expressly accepted the same, and thereby assumed the obligations imposed by the terms of the promise; and upon the strength of this promise, and others, were enabled to continue the purpose of the college, when, without it, it would have been necessary that they suspend operations and dissolve the corporation. As already stated, plaintiff was incorporated as an educational institution, and depended for its support, and to enable it to carry out its purposes, upon donations of philanthropists, and other charitably disposed persons. Such institutions are expressly authorized, under the provisions of the statute under which plaintiff was incorporated, to accept and receive such donations, and may be compelled and required by the Courts to carry out faithfully the purposes of a particular donation. Money contributed to it for the purpose of an en-

dowment fund may not be diverted from that purpose, and its application .may be compelled by proper judicial proceedings. Many of the colleges of the present day depend almost wholly upon voluntary contributions for their support, and philanthropists who contribute thereto are impelled to do so by their sentiments of charity, benevolence, and good will; and the opportunity amply repays the outlay, and to them is far greater than any considerations of a pecuniary nature."

Another point of view from which such a subscription may be upheld is thus suggested by the Illinois Court in the case of *Beatty v. Western College,* 177 Ill., 280; 52 N. E. 432; 42 L. R. A., 797; 69 Am. St. Rep., 248:

"But while such a note, amounting to a mere gift, is open to the defense of a want of consideration, yet that defense cannot be made to it, if money has been expended, or liabilities have been incurred, in reliance upon the note. If money has been expended, or liabilities have been incurred, which, by legal necessity, must cause loss or injury to the person, so expending money or incurring liability, if the note is not paid, the donor or maker thereof is, in good conscience, bound to pay; and the gift will be upheld upon the ground of estoppel, and not by reason of any valid consideration in the original undertaking."

In our own case of *Bates v. Taylor,* 28 S. C., 476; 6 S. E., 327, the action was for the recovery of a parcel of land, which had been subscribed by John Bates, some 40 years before the commencement of the suit, for the erection of an academy. Bates had subscribed $500 and 37 acres of land; others had also contributed to the building fund. No deed appears to have been made for the land, but the academy and a teachers' home were erected thereon. On appeal from a judgment for defendants, one of the questions raised was as to whether the subscription or contribution of John Bates "was for a valuable consideration." This Court said:

"Assuming, then, that the fact was so found by the jury [that Bates had given the land for that purpose and that the academy had been built], it is still further contended that it was error of law to hold that the written agreement of John Bates to give cash and this land 'to Dr. D. W. Ray for the purpose of building a male and female academy in the neighborhood of Good Hope,' was a contract (not a gift) for valuable consideration, which had the effect of divesting the donor, John Bates, of his·title to the land, and transferring it to the members of the 'Palmetto Society.' The view seems to be that the ruling was error, for the ·reason that no private advantage was intended for the members of the society individually, but only the use of the lands was givĕn to the society as a body for certain specified purposes—leaving the title or right of reverter still in the donor. We cannot accept this view. We agree with the Judge that it was a mutual contract between the parties for valuable consideration, or in the nature of a dedication of the land and money for certain specified public purposes, and could have been enforced in law against John Bates in his lifetime."

In the light of the foregoing expression of judicial opinion and of the fundamental principles of law and equity applicable to the enforcement of contractual obligations, we are of the opinion that the validity of an executory agree-- ment to contribute to the promotion of an object which, in a judicial sense, is charitable in its character may properly be referred to and tested by the following general rules:

1. A subscription for a charitable purpose will be considered gratuitous and as merely a continuing offer to make a gift, which may be withdrawn and is unenforceable until accepted and acted upon by the promisee in such a manner as to establish mutuality of obligation as between the promisor and promisee.

Where the promisee has, before withdrawal, accepted the subscription, and has expressly, or by clear implication, agreed to apply the promised contribution to the purpose for which it was subscribed, and has thereby assumed the discharge of an obligation, which may be enforced in law or in equity, the element of valuable consideration to support the promisor's agreement is supplied by the enforceable covenant of the promisee; there is then promise for promise; and therefrom springs a valid and enforceable contract.

"Promise for promise is a sufficient consideration." *Rice v. Sims,* 8 Rich., 416. *Kinsler v. Pope,* 5 Strob., 126.

And the mutual promises are in legal sense simultaneous when the continuing promise of one is met by, and is the inducement for, the reciprocal promise of the other.

2. Where, in the absence of a formal acceptance or promise or covenant on the part of the promisee to assume the performance of an enforceable obligation, the promisee or beneficiary on the faith of the subscription and before its withdrawal has expended money or incurred liabilities in furtherance of the enterprise or undertaking that the promisor intended to promote, the reciprocal promise or covenant on the part of the promisee required to supply the element of consideration will be implied, or the expense incurred or liabilities assumed will be regarded as in the nature of an executed consideration induced by the request impliedly contained in the subscription offer. *Mecham v. McKie,* 1 Hill, 374. *Ayer v. Hay,* 2 Mill, Const., 365; 12 Am. Dec., 681.

And it is not essential for the sufficiency of the consideration that the promise of the subscriber be the sole inducement to the activities and expenditures of the beneficiary. 25 R. C. L., 1402; *Brokaw v. McElroy, supra.*

3. Where it clearly appears that a number of subscribers, whether upon the same paper and at the same time or not, promise to contribute money on the faith of the common engagement, for the accomplishment of an object of interest to all, and which cannot be accomplished save by their common performance, there is. such privity between one subscriber and the others as will make the mutual promises constitute reciprocal obligations, enforceable at the instance of those charged with the duty of carrying into effect the common purpose. *Irwin v. Lombard University, supra.*

4. Where money has been expended or liabilities incurred on the faith of a subscription by the promisee, or where it is within the contemplation of a subscriber that his contribution will be used as an inducement to contributions by others, and additional subscriptions are made by reason of such inducement, even in part, the consideration to support the contract, while perhaps not amounting to a technical estoppel, contains the substantial elements of an estoppel in *pais,* since to permit one, who by his promise has induced another to change his situation to his injury, to repudiate such promise would enable him to perpetrate a fraud. 13 C. J., 318; *Brokaw v. McElory, supra.*

Applying the foregoing principles to the case at bar, we think there is no difficulty in giving legal sanction to the voluntary act and manifest purpose of Mr. Waller in making this subscription. The evidence is susceptible of inferences that tend to support the validity of the subscription in either of the several points of view above suggested. The motion of defendants for a directed verdict was therefore properly refused.

The second contention of appellants is that, even if the evidence were susceptible of one or more inferences of fact that would support the validity of the subscription under either of the several theories of the law indicated,

nevertheless the question was one for the jury's determination.

In a law case, where the facts upon which a conclusion of law depends are put in issue by the pleadings, and are not admitted upon the trial, it is ordinarily the exclusive prerogative of the jury to pass upon the credibility of the witnesses and to find the facts.

But where the evidence adduced by a party is uncontradicted, is not conflicting or contradictory in itself, and is of such conclusive force and effect as would warrant the Circuit Judge in setting aside a verdict for the opposite party, the direction of a verdict by the trial Court will not be pronounced error of law. There is one view of the evidence which we think warranted the direction of the verdict for the plaintiff; and that is that it was susceptible of no other reasonable inference than that the plaintiff prior to the death of Mr. Waller, had on the faith of the subscriptions, of which the Waller contribution was one, enlarged its plans, incurred legal liability for the erection of buildings (dormitory, December 30, 1919), increased its work within the scope of its corporate purpose, and assumed the enforceable responsibility and duty of applying the money subscribed to the object for which it was given.

The position that the university was not justified in relying upon the subscriptions generally, in that most of them were revocable in terms, and that it was essential that action should have been predicated specifically upon the Waller subscription or induced thereby, under the foregoing views of the law, is untenable. In relying upon the subscriptions generally, and expending money and incurring liability against them, since the Waller subscription, not revocable in terms, was a part thereof, the fact that reliance upon the other subscriptions might have been improvident, would not affect the right to rely on the whole to the extent the Waller paper was a part

thereof. And if the subscriptions as a whole were relied on, necessarily the Waller paper, a part thereof, was relied on. We are therefore of the opinion that the direction of the verdict for the plaintiff may not be pronounced error of law.

The judgment of the Circuit Court is accordingly affirmed.

MR. JUSTICE WATTS did not sit.